AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the Google account portersean67@gmail.com that is stored at premises controlled by Google LLC

Case No. 3:21MJ146

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A-1

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | | *Offense Description* |
|---|---|---|
| | SEE ATTACHMENT C-1 | |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ___________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrea R. Kinzig, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date: 4/14/21

*'s signature*

City and state: Dayton, OH

, U.S. Magistrate Judge
*ıame and title*

# ATTACHMENT A-1

Information associated with the Google account **portersean67@gmail.com** that is stored at premises controlled by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

**ATTACHMENT B-1**
**Particular Things to be Seized**

## I. Information to be disclosed by Google LLC (the "Provider")

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, including any e-mails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

1. Subscriber Information: Any available subscriber information for the account, including the following: user-provided name; account email address; account status; Google services used by account; recovery email and SMS recovery number; account creation date and time; terms of service IP address, date, and time; language; Google Account ID ; last logins to the account, including IP address, date, and time; and accounts associated with a particular device, SMS recovery number, IMEI, or Android ID.

2. IP Logs: Logs of IP addresses utilized to access the Google account.

3. Gmail: The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails.

4. Contacts: Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history.

5. Calendar: Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

6. Messaging: The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

7. Google Drive and Google Keep: The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

8. Photos: The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses.

9. Maps: All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

10. Location History: All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

11. Chrome and My Activity: All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant. Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the Provider shall disclose responsive data by sending it to the Federal Bureau of Investigation at 7747 Clyo Road, Centerville, Ohio, 45459, or making the data available to the Federal Bureau of Investigation via the Provider's electronic portal.

## II. Information to be seized by the government

Items evidencing violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) and 2252A(a)(2) and (b)(1) (distribution and receipt of child pornography), 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) and 2252A(a)(5)(B) and (b)(1) (possession of child pornography), 18 U.S.C. §§ 2251(a) and (e) (production and attempted production of child pornography), § 2422(b) (coercion and enticement), and § 1470 (transfer of obscene materials to minors), from January 1, 2020 to the present, including but not limited to the following:

1. Any visual depictions and records related to the possession, receipt, distribution, and production of child pornography; coercion and enticement; and transfer of obscene materials to minors.

2. Any images or videos depicting child pornography.

3. Any and all child erotica, including images and videos of children that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

4. Any Internet or search history indicative of searching for child pornography or content involving children.

5. Any communications with others in which child exploitation materials and offenses are discussed and/or traded.

6. Any communications with minors, and any identifying information for these minors.

7. Any information related to the use of aliases.

8. Evidence of utilization of email accounts, social media accounts, online chat programs, dating websites, and peer-to-peer file sharing programs.

9. Evidence of utilization of telephone accounts, Internet Service Providers, and other Electronic Service Providers, including but not limited to monthly statements.

10. Any information related to Internet Protocol (IP) addresses accounts accessed by the accounts.

11. Any geo-location information for the account or other records reflective of the whereabouts of the account user.

12. Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts.

## ATTACHMENT C-1

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 2252(a)(4)(B) & (b)(2) | Possession of Child Pornography |
| 18 U.S.C. §§ 2252A(a)(5)(B) & (b)(1) | Possession of Child Pornography |
| 18 U.S.C. §§ 2252(a)(2) & (b)(1) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. §§ 2252A(a)(2) & (b)(1) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. §§ 2251(a) and (e) | Production and Attempted Production of Child Pornography |
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 1470 | Transfer of Obscene Materials to Minors |

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Andrea R. Kinzig, being duly sworn, depose and state the following:

## INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. §§ 2252(a) and 2252A) and coercion and enticement (in violation of 18 U.S.C. §2422). I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media, including computer media.

2. Along with other agents, officers, and investigators of the FBI and Department of Homeland Security Investigations, I am currently involved in an investigation of child pornography and child exploitation offenses committed by SEAN T. PORTER (hereinafter referred to as "PORTER"). This Affidavit is submitted in support of an Application for a search warrant for the following:

   a. Information associated with the Google account **portersean67@gmail.com** that is stored at premises controlled by Google LLC (as more fully described in Attachment A-1).

3. The purpose of the Application is to search for and seize evidence of suspected violations of the following:

   a. 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) and 2252A(a)(5)(B) and (b)(1), which make it a crime to possess child pornography;

   b. 18 U.S.C. §§ 2252(a)(2) and (b)(1) and 2252A(a)(2) and (b)(1), which make it a crime to receive and distribute child pornography through interstate commerce;

   c. 18 U.S.C. §§ 2251(a) and (e), which make it a crime to produce or attempt to produce child pornography;

   d. 18 U.S.C. § 2422(b), which makes it a crime to use a facility of interstate or foreign commerce to coerce and entice of a minor to engage in illegal sexual activities or attempt to do so; and

   e. 18 U.S.C. § 1470, which makes it a crime to transfer obscene materials to minors.

4. The items to be searched for and seized are described more particularly in Attachment B-1 hereto and is incorporated by reference.

5. As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

6. This Affidavit is intended to show that there is sufficient probable cause to support the searches of the above noted account (as described in Attachment A-1) and does not contain every fact known to the investigation.

7. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and/or property designed for use, intended for use, or used in committing a crime of violations of federal law, including 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2), 2252A(a)(5)(B) and (b)(1), 2252(a)(2) and (b)(1), 2252A(a)(2) and (b)(1), 18 U.S.C. §§ 2252(a) and (e), 18 U.S.C. § 2422(b), and 18 U.S.C. § 1470, are present within the information associated with the above noted account (as described in Attachment A-1).

## JURISDICTION

8. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL CRIMINAL STATUTES

9. 18 U.S.C. § 2252(a)(2) and (b)(1) states that it is a violation for any person to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, shipped, or transported in or affecting interstate or foreign commerce or which contains materials which have been mailed or so shipped or transported by any means, including by computer, or to knowingly reproduce any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

10. 18 U.S.C. § 2252A(a)(2) and (b)(1) states that it is a violation for any person to receive or distribute (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and (B) any material that contains child

pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

11. 18 U.S.C. § 2252(a)(4)(B) and (b)(2) states that it is a violation for any person to knowingly possess, or knowingly access with the intent to view, one or more matters which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

12. 18 U.S.C. § 2252A(a)(5)(B) and (b)(1) states that it is a violation for any person to knowingly possess, or knowingly access with intent to view, any book, magazine, periodical, film, videotape, computer, disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

13. 18 U.S.C. §§ 2251(a) and (e) states that it is a violation for any person to knowingly employ, use, persuade, induce, entice, or coerce any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, when he knew or had reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or attempts or conspires to do so.

14. 18 U.S.C. § 1470 states that it is a violation for any person to knowingly use the mail or any facility or means of interstate or foreign commerce to transfer obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempts to do so.

15. 18 U.S.C. § 2422(b) states that is a violation for any person to use the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, to knowingly persuade, induce, entice, or coerce any

individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or to attempt to do so.

a. For purposes of the statute, 18 U.S.C. §2427 states that the term "sexual activity for which any person can be charged with a criminal offense" includes the production of child pornography, as defined in section 2256(8).

## BACKGROUND INFORMATION

### Definitions

16. The following definitions apply to this Affidavit and Attachment B-1 to this Affidavit:

a. "**Child Pornography**" includes the definition in Title 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

b. "**Visual depictions**" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image (see 18 U.S.C. § 2256(5)).

c. "**Minor**" means any person under the age of eighteen years (see 18 U.S.C. § 2256(1)).

d. "**Sexually explicit conduct**" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person (see 18 U.S.C. §§ 2256(2) and 1466A(f)).

e. An "**Internet Protocol address**", also referred to as an "**IP address**", is a unique numeric address that computers or electronic devices use in order to communicate with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address. An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone. IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. There are two types of IP addresses; static and dynamic. A static address is permanently assigned to a particular device and as a practical matter never

changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the duration of the session that the client computer is connected to the Internet (or other network).

f. "**Hyperlink**" (often referred to simply as a "link") refers to a navigation element in a web page or document that automatically brings the referred information (a.k.a. "resource") to the user when the navigation element is selected by the user. Hyperlinks are part of the foundation of the World Wide Web, but are not limited to a website for HTML.

g. "**Website**" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

h. "**Uniform Resource Locator**" or "**Universal Resource Locator**" or "**URL**" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

i. "**Social Media**" is a term to refer to websites and other Internet-based applications that are designed to allow people to share content quickly, efficiently, and on a real-time basis. Many social media applications allow users to create account profiles that display users' account names and other personal information, as well as to exchange messages with others. Numerous forms of social media are presently available on the Internet.

j. The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

Collectors of Child Pornography

17. Based upon my knowledge, training, and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the collection of child pornography (hereafter "collectors"):

a. Collectors may receive sexual stimulation and satisfaction from contact with children, or from having fantasies of children engaged in sexual activity or suggestive poses, or from literature describing such activity.

b. Collectors may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Collectors typically use these materials for their own sexual arousal and gratification. Collectors often have companion collections of child erotica. Child erotica are materials or items that are sexually suggestive and arousing to pedophiles, but which are not in and of themselves obscene or pornographic. Such items may include photographs of clothed children, drawings, sketches, fantasy writings, diaries, pedophilic literature and sexual aids.

c. Collectors who also actively seek to engage in sexual activity with children may use these materials to lower the inhibitions of a child they are attempting to seduce, convince the child of the normalcy of such conduct, sexually arouse their selected child partner, or demonstrate how to perform the desired sexual acts.

d. Collectors almost always possess and maintain their "hard copies" of child pornographic images and reference materials (e.g., mailing and address lists) in a private and secure location. With the growth of the Internet and computers, a large percentage of most collections today are in digital format. Typically these materials are kept at the collector's residence for easy access and viewing. Collectors often place high value on their materials because of the difficulty, and legal and social danger, associated with acquiring them. As a result, it is not uncommon for collectors to retain child pornography for long periods of time, even for years.

e. Collectors also may correspond with and/or meet others to share information and materials. They may save correspondence from other child pornography distributors/collectors, including contact information like email addresses, and may conceal such correspondence as they do their sexually explicit material.

f. Collectors prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g. Subscribers to websites that are primarily designed to provide child pornography have a strong likelihood of being collectors of child pornography. This high degree of correlation between subscription and collection behavior has been repeatedly confirmed during several recent nationwide law enforcement initiatives.

Google Services

18. Google LLC ("Google") is a multi-national corporation with its headquarters located in Mountain View, California. Google offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

19. In addition, Google offers an operating system ("OS") for mobile devices (including cellular phones) known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

20. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

21. Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below. Google's services include but are not limited to the following:

a. Gmail: Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

b. Contacts: Google provides address books for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate

with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

c. Calendar: Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

d. Messaging: Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

e. Google Drive: Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me". Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

f. Google Keep: Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep

notes are stored indefinitely, unless the user deletes them. Android device users can also use Google Drive to backup certain data from their device. Android backups on Google Drive may include mobile application data, device settings, file downloads, and SMS messages. If a user subscribes to Google's cloud storage service, Google One, they can opt to backup all the data from their device to Google Drive.

g. Google Photos: Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

h. Google Maps: Google offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

i. Location History: Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user

affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

j. Chrome and My Activity: Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

k. Android Backup: Android device users can use Google Drive to backup certain data from their device. Android backups on Google Drive may include mobile application data, call history, contacts, device settings, or SMS messages. Users can also opt-in through Google One to back up photos, videos, and multimedia sent using Messages

22. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

23. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

24. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

25. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

26. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

27. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

28. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

29. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

30. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

31. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and

experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

Wildec LLC Dating Applications

32. Wildec LLC is a software developer company based in Everett, Washington. Wildec LLC produces a number of dating applications for mobile devices, including Meet24, FastMeet, Meet4U, and MeetEZ.

33. Meet24 is a free dating application available on android cellular telephones, iPhones, and iPod Touches. Similar to other dating applications, Meet24 allows users to create account profiles. Account profiles typically include a profile picture, a profile name, an age, a geographic location, and a statement about the user's status. Individuals can also include other information in their profiles such as their sexual orientation, height, body weight, ethnicity, education, smoking preference, etc.

34. The Meet24 application uses geolocation information to allow users to find dating partners in their geographic areas. The application also allows users to exchange direct text messages, photographs, and video messages with other users.

35. FastMeet, Meet4U, and MeetEZ are other free online dating applications available on android cellular telephones, iPhones, and iPod Touches. These applications provide users with similar features as the Meet24 application, including the ability to exchange direct text messages, photographs, and video messages with other users.

36. Based on my training and experience, I know that individuals frequently change their account profiles on dating applications such as Meet24. Some individuals frequently change their profile pictures, profile names, ages, and physical locations. It is not uncommon for individuals to list inaccurate ages on their profiles. Older individuals sometimes identify themselves as being younger than they actually are in an effort to make themselves appear more attractive to younger potential partners.

37. I have learned that in or around May 2019, the Federal Trade Commission (FTC) issued a warning that three of Wildec LLC's dating applications – that being Meet24, FastMeet, and Meet4U – appeared to violate the Children's Online Privacy Protections Act. Media reports stated that these applications did not prevent users who were under the age of 13 years old from using the applications or being visible to other users. In response to these concerns, both Apple and Google temporarily removed the applications from their respective application stores. The three applications were restored after Wildec LLC updated their terms and conditions for use to state that users under the age of 18 years old could not use their websites.

38. Based on my training and experience, I know that many social media and dating websites (currently to include Meet24, FastMeet, Meet4U, and MeetEZ) state that minors cannot use the websites. Based on my training and experience, I know that Meet24 and other social media and

dating websites have little to no means to enforce this policy. I also know, based on my training and experience, that minors commonly utilize these websites. I have been involved in a number of prior investigations in which minors utilized the social media and dating websites that they are supposedly prohibited from using. In these cases, the minors were targeted and sexually exploited by adult offenders.

39. To use the Meet24, FastMeet, Meet4U, and MeetEZ applications, users must complete a registration process that includes providing information such as a profile name, email address, gender, birthday, and location. Wildec LLC maintains this registration information that is provided by its users, as well as other information such as the registration dates and the IP addresses utilized to register the accounts. Wildec LLC assigns its users with unique user identification numbers during the registration process.

WhatsApp and TextNow

40. WhatsApp is a cross-platform centralized messaging and Voice over Internet Protocol (VOIP) service owned by Facebook Inc. The WhatsApp application allows users to send text messages and voice messages, make voice and video calls, and share files (including images, videos, and documents). The WhatsApp application runs on mobile devices, but it is also accessible from desktop computers as long as the user's mobile device remains connected to the Internet while he/she uses the desktop application.

41. WhatsApp requires that users provide a standard cellular telephone number when registering with the service. The latest version of the application contains end-to-end encryption to secure messages.

42. TextNow is a VOIP application available on smartphones and tablets. The application is owned and operated by TextNow Inc., a company based in Canada. The application assigns users telephone numbers, and the users can use these numbers to make telephone calls and send and receive text messages via wireless Internet service. TextNow's network piggybacks on other cellular telephone networks to provide wireless coverage for smartphones.

43. Based on my training and experience, I know that individuals who utilize telephones in furtherance of their criminal activities often utilize VOIP applications such as WhatsApp and TextNow. These applications are free of charge, and the providers maintain minimal subscriber information for their users – allowing users to conceal their identities.

**FACTS SUPPORTING PROBABLE CAUSE**

Criminal History for PORTER

44. Records from the Hamilton County (Ohio) Common Pleas Court revealed that PORTER was convicted on or around April 29, 2003 of one count of Attempted Sexual Conduct with a

Minor, in violation of Ohio Revised Code (O.R.C.) § 2907.04(A), and one count of Soliciting Another by Means of a Telecommunications Device to Engage in Sexual Activity, in violation of O.R.C. § 2907.07(E)(2) (pursuant to case C/03/CRA/9889). PORTER was sentenced to six months of imprisonment.

45. Records from the Greene County (Ohio) Common Pleas Court revealed that PORTER was convicted on or around May 16, 2005 of two counts of Importuning, in violation of O.R.C. § 2907.07(D)(2) (pursuant to case 2004-CR-533). PORTER was sentenced to twelve months of imprisonment.

46. Records from the United States District Court for the Southern District of Ohio revealed that PORTER was convicted in or around January 2009 of one count of Possession of Child Pornography, in violation of 18 U.S.C §§ 2252(a)(4)(B) and (b)(2) (pursuant to case 3:08CR163). PORTER was sentenced to 120 months of imprisonment and lifetime of supervised release.

PORTER's Term of Supervised Release

47. On or around February 28, 2018, PORTER was released from the Bureau of Prisons' custody from his 2009 conviction and began his lifetime term of supervised release. He is currently supervised by Probation Officer (PO) Christopher Owens of the United States Probation Service in Dayton, Ohio. As part of the conditions of his supervised release, PORTER is prohibited from using, owning, or possessing any computer or computer-related equipment without prior approval of his probation officer. PORTER is also required to permit the installation of software to monitor the computer activities on any computer device that he is authorized to use.

48. Based on information from PO Owens, I have learned the following additional information about PORTER:

a. PORTER resides at 2317 Adrian Court in Dayton, Ohio (hereinafter referred to as the "SUBJECT PREMISES"). PO Owens has conducted regular home visits at this residence and has verified that PORTER resides there. The most recent home visit was conducted on or around March 9, 2021.

b. PORTER's brother also previously resided at the SUBJECT PREMISES. During the most recent home visit (on or around March 9, 2021), PORTER reported to PO Owens that the brother had moved out of the SUBJECT PREMISES.

c. PO Owens previously provided authorization for PORTER to utilize a flip-style cellular telephone bearing telephone number 937-626-4691 and a Samsung Model SM-T650NU tablet. PO Owens has not authorized PORTER to utilize any other electronic devices.

d. PO Owens has communicated with PORTER via telephone number 937-626-4691.

e. Monitoring software utilized by the United States Probation Service was installed on PORTER's Samsung tablet on or around April 24, 2019. PO Owens has utilized this monitoring software to periodically review PORTER's activities on the tablet. PO Owens also periodically manually reviewed PORTER's cellular telephone and tablet during home visits. PO Owens has not located any child pornography or unauthorized contents on PORTER's tablet or cellular telephone during these reviews.

f. PORTER has reported to PO Owens that he (PORTER) utilizes the email address stphs141963@gmail.com.

g. PORTER is self-employed and has a business where he installs flooring units.

h. PORTER was previously married, and he has an adult son.

i. PO Owens has observed PORTER drive a navy blue Ford Explorer. PO Owens has also observed a gray Chevrolet Trailblazer and a motorcycle parked at the SUBJECT PREMISES.

Sex Offender and Ohio Bureau of Motor Vehicles Information

49. As part of the three prior convictions detailed above, PORTER is currently required to register as a sex offender. PORTER initially completed his sex offender registration paperwork on or around January 31, 2018. He is required to renew his registration on a semi-annual basis. On his current sex offender registration paperwork, PORTER identified that he resides at the SUBJECT PREMISES and drives two motor vehicles a Ford Explorer (hereinafter referred to as the "SUBJECT VEHICLE-1" and a Chevrolet Trailblazer (hereinafter referred to as the "SUBJECT VEHICLE-2").

50.

51. Records from the Ohio Bureau of Motor Vehicles identified that PORTER utilizes the SUBJECT PREMISES on his current Ohio driver's license. This driver's license was issued on or around March 10, 2018. Records from the Ohio Bureau of Motor Vehicles also identified that SUBJECT VEHICLE-1 and SUBJECT VEHICLE-2 are presently registered to PORTER at the SUBJECT PREMISES.

2020 Undercover Investigation by FBI Memphis Division

52. In 2020 and 2021, the Memphis division of the FBI conducted various online, covert investigations to identify individuals utilizing dating applications to communicate with and sexually exploit minors. In November 2020, an FBI agent acting in an undercover capacity (hereinafter referred to as "UCO-1") utilized a profile on the Meet24 website posing as a 14-year old female child. UCO-1's account profile picture depicted a clothed female[1]. The

1 The profile pictures that UCO-1 utilized, as well as other pictures she sent to "Mike" throughout the course of the investigation (as further detailed below), actually depict an adult female who appears young. This adult female consented for the FBI to utilize her photographs as part of online undercover child exploitation investigations.

account profile stated that UCO-1 was an 18-year old female, but her[2] status stated "Im really 14".

53. On or around November 10, 2020, an individual utilizing the profile name of "Mike" contacted UCO-1 via Meet24's direct text messaging feature. UCO-1 viewed the Meet24 account profile for "Mike" and saw that the profile picture depicted a white male. The account profile for the account stated that "Mike" was 20 years old and lived in Moraine, Ohio.

   a. I have compared the "Mike" profile picture to PORTER's current Ohio driver's license photograph. Based on this comparison, it appears that PORTER is depicted in the "Mike" profile picture.

   b. I know that Moraine, Ohio and Miami Township, Ohio (where the SUBJECT PREMISES is located) are in close proximity to each other.

54. "Mike" communicated with UCO-1 via Meet24's direct text messaging feature during the approximate time period of November 10, 2020 through November 18, 2020. Below is a summary of these communications:

   a. "Mike" inquired about UCO-1's age, and UCO-1 identified that she was 14 years old. UCO-1 reiterated her age on multiple occasions throughout the communications. "Mike" identified that he was 43 years old.

      i. PORTER is currently 58 years old. Based on my training and experience, I know that individuals who utilize dating websites often falsely identify their ages. Individuals often portray themselves as being younger than they are as a means to make themselves appear more attractive to younger individuals.

      ii. Also based on my training and experience, I know that individuals involved in child exploitation offenses often falsely portray their names, ages, and/or the locations where they reside as a means to conceal their identities from law enforcement officers.

   b. "Mike" inquired on several occasions if UCO-1 was a law enforcement officer. "Mike" also inquired if UCO-1 hid the communications on her cellular telephone from her mother.

   c. "Mike" inquired about UCO-1's past sexual experiences and if she liked older men. "Mike" told UCO-1 that he would like to have sex with her. Later in the communications, "Mike" told UCO-1 that he could not meet with her in person because

2 Although UCO-1 is a male FBI agent, he will be referred to in this Affidavit with female pronouns given that he was using a female persona.

it would be illegal to do so. However, he noted that they could still have "fun" on the Meet24 application.

d. "Mike" asked UCO-1 for nude pictures of herself.

i. Based on my training and experience, I know that "Mike's" requests for nude photographs are consistent with individuals who are attempting to coerce and entice minors to produce child pornography, which the offenders are attempting to receive and possess.

e. When "Mike" continued to ask UCO-1 for pictures of herself, UCO-1 suggested that he send her pictures depicting other girls who were posing how he wanted her to pose. "Mike" sent UCO-1 an image of a young female child wearing a bathing suit with her legs spread apart. "Mike" then claimed that he did not know how he got that picture, and that he did not have any "nudes" of young girls (presumably referring of nude photographs of minors).

f. "Mike" sent two images of his nude genitalia to UCO-1. These images did not include the man's face.

i. Based on my training and experience, I believe that these images are obscene.

g. "Mike" also sent UCO-1 another picture that purportedly depicted himself. This picture included the man's face

i. Based on comparing this photograph to PORTER's current Ohio driver's license photograph, it appears that PORTER is the individual depicted in the photograph sent by "Mike" to UCO-1.

h. Below are excerpts from the Meet24 chats summarized above:

Mike: I'm just horny lol
Mike: how old are you
UCO-1: im 14. u?
UCO-1: ok then sorry
Mike: I'm 43
Mike: do you like older men
UCO-1: yeah i guess. i am tired of boys my age
Mike: can I see a picture of you
UCO-1: *Sends clothed image of a female*
Mike: you look older then 14
Mike: why are you tired of boys
UCO-1: well thanks. im almost 15

UCO-1: have u met 14 year okd boys? they are so stupid and awkward lol
Mike: I was 14 once I understand
Mike: have you had sex yet
Mike: are you there
UCO-1: im a virgin but done other stuff
Mike: what have you done
UCO-1: like made out and given hand jobs and blow jobs and stuff
Mike: do you like that stuff
Mike: have you had pussy ate
UCO-1: nobody ever gone down on me yet
Mike: I would
Mike: where are you from
UCO-1: TN
Mike: how can I be sure you are real and not a cop
UCO-1: im not a cop lol seriously
Mike: you never know
Mike: send me a nude of you to prove it
UCO-1: f off not doing that. scam.

. . . . .

UCO-1: my mom was calling me i talked to her is that ok
Mike: yeah that's okay as long as your mother doesn't bother us
Mike: does she ever check your phone or computer to see if you're talking with older men

. . . . .

Mike: I wish you were a couple years older kind of scares me to talk to you it's not really right
UCO-1: y not?
Mike: because you are only 14 years old and I'm 43
Mike: what makes you want an older man besides the young boys being immature
UCO-1: i dont care bout age but if u do we don't have to talk i understand
Mike: I mean if you just want to have sex why not have it with a young boy I mean when I was 14 my dick was just as big as it is today
Mike: no we can still talk

. . . . .

*[When UCO-1 didn't reply to Mike's messages]:*

Mike: are you in your bedroom
Mike: see that makes you seem like a cop just leaving me and I are probably going to prosecute before what I didn't so s***
UCO-1: stop it
Mike: so why did you stop talking to me
UCO-1: i was busy sorry
UCO-1: ur kinda bossy

. . . . .

UCO-1: shes home *[referring to UCO'1's mother]*

Mike: does she check your phone or whatever you're using

. . . . .

Mike: how old did you say you were again because you look older than 14
Mike: I'm not saying you're older than 14 I'm just asking
UCO-1: im 14. same as yesterday.
Mike: so when do you turn 15
UCO-1: march
Mike: do you like talking to me
Mike: he really care about my age
UCO-1: i dont care about age
Mike: so have you had sex yet I don't remember if you told me that or not and I can't look back on it because I deleted all my texts
UCO-1: no im a virgin
Mike: so why do you want to talk to older men

. . . . .

Mike: don't get me wrong I think you are very beautiful I wish you were 18 years old right now
UCO-1: look we don't have to talk if u don't want to
Mike: no I want to talk with you I like you
Mike: I'm just kind of nervous you are a cop
Mike: because a lot of cops pose this little girls 14 years old or whatever and they want to bust big guys for talking to
UCO-1: omg
Mike: what do you mean
UCO-1: lets just not talk anymore u seem to not be comfortable with it. sorry.
Mike: no I want to talk with you

. . . . .

Mike: *Sends image of a male who appears to be PORTER*
UCO-1: *Sends two clothed images of a female*
Mike: you look beautiful baby
Mike: did you say you had sex I can't remember I'm sorry I'm a little buzzed tonight
Mike: no you told me you were a virgin
UCO-1: lol. im a virgin
UCO-1: but i done ither stuff
Mike: until you want to have sex
Mike: would you like to have sex with me
UCO-1: yeah maybe
Mike: I would love to have sex with you
UCO-1: yeah lol
Mike: I would love to be with you
UCO-1: ok mite be fun loo
UCO-1: lol
Mike: do you want to see a naked of me
UCO-1: sure if u want me to

| | |
|---|---|
| Mike: | I like that you're open |
| Mike: | *Sends image of a nude male (whose face is not captured in the image) holding an erect penis* |
| UCO-1: | nice |
| Mike: | he like that baby |
| Mike: | do you like that baby |
| Mike: | *Sends close-up image of a male holding his penis* |
| UCO-1: | looks good to me |
| Mike: | I like you baby can you send me a new picture of you |
| Mike: | I want to see a nude |
| UCO-1: | oh i don't have any nude pics |
| Mike: | can't you take a picture |
| UCO-1: | i mean maybe. what u wanna see? |
| Mike: | just stand in front of your camera take your clothes off let me see your body |
| UCO-1: | i really don't like sending pics like that |
| Mike: | but it's with me baby I will never trade it with anybody else I promise you that |
| | . . . . . |
| UCO-1: | send me some pics of girls from the internet in poses u want me to do and then ill take pics in the same pose |
| Mike: | I just want you to be nature |
| Mike: | *Sends image depicting a female child wearing a bathing suit with her legs spread apart* |
| Mike: | can you do that please |
| UCO-1: | no. cause im not 6 years old lol |
| Mike: | I don't have any nudes of any young girls |
| Mike: | I don't even know where I got that picture at |
| Mike: | let me see wireless looking through my pictures |
| Mike: | I'm just going to let you know okay |
| Mike: | I just want to see you picture I want to see something that shows me that you're real |
| | . . . . . |
| Mike: | you know I know you're only 14 but you're making me fall in love with you |
| UCO-1: | lol ok |
| Mike: | so you want to really continue to keep in contact with me |
| UCO-1: | yeah sure |
| Mike: | I would love to keep in contact with you too |
| Mike: | maybe when you're 18 we can get together but I can't do that before then that would be a legal one he would be wrong |
| UCO-1: | ok |
| Mike: | I'm not discouraging you but I just can't meet somebody that's under age |
| Mike: | does it mean we can have fun here though |

2021 Undercover Investigation by FBI Memphis Division

55. In February 2021, an FBI agent acting in an undercover capacity (hereinafter referred to as "UCO-2")[3] utilized a profile on the Meet24 website posing as a 13-year old female child. UCO-2's account profile picture depicted a clothed female[4]. The account profile stated that UCO-1 was an 18-year old female, but her status stated "Im 18 minus 5".

56. On or around February 14, 2021, an individual utilizing the profile name of "Sean" contacted UCO-2 via Meet24's direct text messaging feature. UCO-2 viewed the Meet24 account profile for "Sean" and saw that the profile picture depicted a white male. The account profile identified that "Sean" was 20 years old and lived in Moraine, Ohio.

a. I have compared the "Sean" profile picture to PORTER's current Ohio driver's license photograph. Based on this comparison, it appears that PORTER is depicted in the "Sean" profile picture.

b. I know that Moraine, Ohio and Miami Township, Ohio (where the SUBJECT PREMISES is located) are in close proximity to each other.

57. "Sean" communicated with UCO-2 via Meet24's direct text messaging feature on or around February 14, 2021. Below is a summary of these communications:

a. "Sean" began the communications by telling UCO-2 that he had a sexual relationship with his 12-year old daughter. "Sean" sent UCO-2 a photograph of a female child, which he purported to be of his daughter. When UCO-2 questioned "Sean" about his relationship with this child, he then stated that he did not actually have a daughter.

i. Based on the investigation conducted to-date, it does not appear that PORTER has a daughter.

ii. Based on my training and experience, I know that individuals involved in child exploitation offenses sometimes fabricate information about sexual experiences they have had with minors. Such individuals do so, among other reasons, as a means to gauge the victims' possible interest in having a sexual relationship with an adult, to de-sensitize the victims to sexually explicit conduct, to test the victims, and to express their own sexual fantasies.

---

3 The same FBI agent who operated the "UCO-1" persona also operated the "UCO-2" persona. Given that a different persona was utilized, this FBI agent will be referred to as "UCO-2" for the 2021 communications. Similar to the 2020 communications, UCO-2 will be referred to in this Affidavit with female pronouns even though the FBI agent is a male.

4 The profile pictures that UCO-2 utilized, as well as other pictures she sent to "Sean" throughout the course of the investigation (as further detailed below), actually depict an adult female who appears young. This adult female consented for the FBI to utilize her photographs as part of online undercover child exploitation investigations.

b. "Sean" inquired about UCO-2's age, and UCO-2 identified that she was 13 years old. UCO-2 reiterated her age on multiple occasions throughout the communications. "Sean" identified that he was 47 years old. "Sean" claimed that although his profile stated that he lived in Ohio, he actually lived in Covington, Kentucky.

   i. PORTER is currently 58 years old. Based on my training and experience, I know that individuals who utilize dating websites often falsely identify their ages. Individuals often portray themselves as being younger than they are as a means to make themselves appear more attractive to younger individuals.

   ii. Also based on my training and experience, I know that individuals involved in child exploitation offenses often falsely portray their names, ages, and/or the locations where they reside as a means to conceal their identities from law enforcement officers.

c. "Sean" inquired about UCO-2's past sexual experiences and if she liked older men. "Sean" talked about the possibility of meeting UCO-2 in person to engage in sexually explicit conduct, and he said that he would like to perform oral sex on her.

d. "Sean" inquired if UCO-2 thought about older men when she masturbated. "Sean" then said that he thought about girls who were UCO-2's age when he masturbated, and that talking to her "turns me on".

e. "Sean" asked UCO-2 for a picture of her vagina.

   i. Based on my training and experience, I know that "Sean's" request for a picture of UCO-2's vagina is consistent with individuals who are attempting to coerce and entice minors to produce child pornography, which the offenders are attempting to receive and possess.

f. "Sean" sent an image of a man's nude genitalia to UCO-2. He also sent UCO-2 a video that depicted a man masturbating. These image and video files did not include the man's face.

   i. Based on my training and experience, I believe that these image and video files are obscene.

g. "Sean" also sent UCO-2 another picture that purportedly depicted himself. This image included the man's face.

i. Based on comparing these approximately four photographs to PORTER's current Ohio driver's license photograph, it appears that PORTER is the individual depicted in the four photographs sent by "Sean" to UCO-2.

h. "Sean" suggested that he and UCO-2 communicate instead via text messages, and he provided his cellular telephone number to UCO-2 – that being 937-568-5895.

i. Below are excerpts from the Meet24 chats summarized above:

| | |
|---|---|
| Sean: | hello beautiful my daughter is 12 and we have sex |
| Sean: | would you like to talk to my daughter |
| Sean: | I have sex with my daughter |
| UCO-2: | great |
| UCO-2: | y tell me that? |
| Sean: | to get you to talk to me |
| Sean: | is it ok I have sex with her |
| UCO-2: | i don't care |
| Sean: | do you want to talk to her |
| UCO-2: | y? |
| Sean: | well you're 13 and she's 12 I thought maybe you would want to talk to her why do you come on here |
| UCO-2: | let me see her |
| Sean: | *Sends image of a female child wearing clothing* |
| Sean: | her name is Jennifer |
| UCO-2: | yeah rite thats a screenshot from this app |
| Sean: | so why do you come on here |
| UCO-2: | so thats really not ur daughter rite? |
| Sean: | no that's not her |
| Sean: | I really don't have a daughter |
| UCO-2: | lol |
| Sean: | at least I got you to talk to me |
| Sean: | I've tried messaging you a dozen times with no reply |
| UCO-2: | says u live in like ohio rite? |
| Sean: | that's what it says but I really live in Kentucky |
| | . . . . . |
| Sean: | are you really only 13 |
| UCO-2: | yes im 13 |
| | . . . . . |
| Sean: | why is a pretty girl like you single I bet you got all kinds of guys trying to go out with you though |
| UCO-2: | well maybe u have heard there a pandemic and im in virtual school so hard to meet people |
| Sean: | you're quite feisty for thirteen |
| Sean: | I like that in you |

| | |
|---|---|
| UCO-2: | lol |
| Sean: | so are you still a virgin |
| UCO-2: | yes |
| Sean: | well that's good |
| Sean: | have you thought about sex before |
| UCO-2: | yeah all the time |
| Sean: | do you want to have sex soon |
| Sean: | when did you start thinking about it all the time |
| UCO-2: | yes i think so |
| UCO-2: | i dunno the last few months |
| Sean: | do you masturbate a lot |
| Sean: | guess you don't want to tell me that lol |
| UCO-2: | not a lot just sometimes |
| UCO-2: | not a lot but sometimes |
| Sean: | do you like it |
| Sean: | when did you start masturbating I started when I was 13 too |
| UCO-2: | how old r u really cause u aint 20 lol |
| Sean: | no I'm 47 |
| Sean: | have you ever thought about being with an older man |
| UCO-2: | ok cool |
| UCO-2: | yes |
| Sean: | so you don't mind my age then |
| UCO-2: | no i don't care bout age |
| Sean: | well that's nice can we be friends |
| Sean: | who knows maybe something beautiful can happen |
| UCO-2: | yea |
| UCO-2: | like what |
| Sean: | oh I don't know we just met each other |
| UCO-2: | ok |
| Sean: | do you have another picture of you |
| UCO-2: | yes |
| Sean: | *Sends image depicting a male who appears to be PORTER* |
| UCO-2: | *Sends image of a female wearing clothing* |
| Sean: | you are very pretty |
| Sean: | so do your parents know you come here to this site |
| UCO-2: | nope |
| | . . . . . |
| Sean: | have you ever thought about having sex with an older man while you masturbate |
| UCO-2: | umm yeah i guess |
| Sean: | well I thought about girls your age when I do it |
| Sean: | talking to you turns me on to |
| | . . . . . |
| Sean: | when was the last time you masturbated |
| UCO-2: | i dunno couple nights ago |

| | |
|---|---|
| Sean: | I did this morning |
| UCO-2: | ok |
| Sean: | was thinking about you |
| | . . . . . |
| Sean: | would you like to meet me someday |
| UCO-2: | u mean in person? |
| Sean: | yes |
| UCO-2: | maybe i dunno |
| UCO-2: | could be fun |
| Sean: | it would be a lot of fun I think |
| Sean: | you said you haven't had sex before right |
| UCO-2: | im a virgin yeah |
| Sean: | *Sends close-up image of a male's penis* |
| Sean: | would you like to have that |
| UCO-2: | maybe |
| Sean: | I would love to go down and lick you |
| Sean: | I'll bet you taste so sweet |
| UCO-2: | nobody ever done that to me |
| Sean: | I know you would love it |
| UCO-2: | probably lol |
| UCO-2: | i heard its amazing |
| Sean: | any chance I can see a picture of it |
| UCO-2: | pic of what? |
| Sean: | I've been told that I lick p**** better than a lesbian |
| Sean: | a pic of your vagina |
| UCO-2: | lol |
| UCO-2: | sorry i don't have any pics like that on my phone |
| Sean: | can't you take a picture |
| UCO-2: | i mean i could texhnically yes |
| Sean: | I'll do something for you |
| UCO-2: | wht? |
| Sean: | *Sends video depicting a male masturbating* |
| | . . . . . |
| Sean: | I would love just to lay with you and cuddle and kiss and caress each other |
| UCO-2: | sorry just gotta be real careful right now my best friend got busted for sending nudes to her boyfriend and his parents found them. she is 13 also it turned into this huge ordeal ya know |
| Sean: | I understand |
| Sean: | well someday you'll be able to I can promise you I'm not a cop |
| | . . . . . |
| Sean: | where else could you chat at |
| UCO-2: | i really hust have this and texting |
| Sean: | do you want my phone number |
| UCO-2: | sure |

| | |
|---|---|
| Sean: | 9375685895 |

58. After "Sean" provided his telephone number (that being 937-568-5895) to UCO-2 in the above detailed Meet24 communications, they communicated with each other via text messages. These communications transpired during the approximate time period of February 14, 2021 through February 15, 2021. Below is a summary of the text messages:

a. UCO-2 reiterated that she was 13 years old, and "Sean" reiterated that he was 47 years old. "Sean" asked how UCO-2's mother would react if she found out that UCO-2 was having a relationship with an older man.

b. "Sean" and UCO-2 talked about what they would want to do if they met with each other in person. "Sean" said that he would want to have sex with UCO-2 in a hotel room.

c. Below are excerpts from the text messages summarized above:

| | |
|---|---|
| UCO-2: | I told u I'm really 13 years old rite? |
| Sean: | Yes you did tell me that |
| Sean: | And I told you that I'm 47 right |
| UCO-2: | Ok just wanted to make sure I don't care bout age do u? |
| Sean: | Is your mom strict or is she relatively easy with you |
| Sean: | I don't care about age either |
| UCO-2: | She is pretty easy I guess |
| Sean: | How would she react if she found out you were seeing an older man |
| UCO-2: | Probably not good lol |
| Sean: | Do you like the idea of being with me |
| UCO-2: | Maybe I don't know u that well yet |
| Sean: | Well if we were to meet what would you want to do |
| Sean: | And it doesn't have to be sexual |
| UCO-2: | What would u hope to happen? Just be honest and I'll be honest if I'm ok with it |
| Sean: | Well I would like to take you out to dinner and take you shopping and buy you some nice things |
| Sean: | And then I would like to take you back to the hotel room and make sweet love to you |
| UCO-2: | Ok lol |
| UCO-2: | Sounds like ur nice |
| Sean: | I wouldn't hurt you sweetheart and if you didn't want to make love I wouldn't force you to do it |
| | . . . . . |
| Sean: | Just so you know I deleted that other app I only want to talk to you and I don't care about any other girls |
| Sean: | There's no need for me to be there anymore so you're going to have to talk to me is |

Results of Subpoenas

59. On or around February 23, 2021 and March 16, 2021, two administrative subpoenas were served upon Wildec LLC requesting subscriber information and IP logs for any Meet24, FastMeet, Meet4U, and MeetEZ accounts associated with the following identifiers: "Sean", age 20, from Moraine, Ohio; and "Mike", age 20, from Moraine, Ohio. Records provided by Wildec LLC in response to the subpoenas provided the following information:

a. An account containing the user identification number of 45521409 was created on or around October 6, 2020. The profile name for the account was "Sean", and the email address associated with the account was sean2598@gmail.com. The user's birthday was listed as October 6, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 119 occasions during the approximate time period of October 6, 2020 through October 15, 2020. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications) was utilized to log into the account on approximately 114 of these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately five occasions.

b. An account containing the user identification number of 45675752 was created on or around October 15, 2020. The profile name for the account was "Sean", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as October 15, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 137 occasions during the approximate time period of October 15, 2020 through October 20, 2020. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the account detailed above) was utilized to log into the account on approximately 101 of these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately 36 occasions.

c. An account containing the user identification number of 45766959 was created on or around October 20, 2020. The profile name for the account was "Sean", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as October 20, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 74 occasions during the approximate time period of October 20, 2020 through October 24, 2020. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the accounts detailed above) was utilized to log into the account on approximately 49 of these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately 25 occasions.

d. An account containing the user identification number of 45834215 was created on or around October 25, 2020. The profile name for the account was "Sean", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as October 25, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 10 occasions on or around October 25. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the accounts detailed above) was utilized to log into the account on approximately eight of these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately two occasions.

e. An account containing the user identification number of 45868159 was created on or around October 27, 2020. The profile name for the account was "Sean", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as October 27, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately one occasion on or around October 27, 2020. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the accounts detailed above) was utilized to log into the account on that date.

f. An account containing the user identification number of 45887212 was created on or around October 28, 2020. The profile name for the account was "Mike", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as October 28, 2000, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 891 occasions during the approximate time period of October 28, 2020 through December 8, 2020. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the accounts detailed above) was utilized to log into the account on approximately 734 of these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately 157 occasions.

g. An account containing the user identification number of 47432599 was created on or around January 24, 2021. The profile name for the account was "Sean", and the email address associated with the account was portersean68@gmail.com. The user's birthday was listed as January 24, 2001, his gender was listed as male, and his location was listed as Moraine, Ohio. The log of IP addresses identified that the account was logged into on approximately 242 occasions during the approximate time period of January 24, 2021 through February 14, 2021. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications, the same IP address utilized to access the accounts detailed above) was utilized to log into the account on approximately 222 of

these occasions. IP addresses serviced by the Verizon cellular telephone network were utilized to log into the account on the remaining approximately 20 occasions.

60. I noted the following information regarding the records detailed above that were provided by Wildec LLC for the seven accounts:

a. The IP address of 74.136.165.234 (an IP address serviced by Charter Communications) was utilized to access all seven of the accounts. The same two email addresses (sean2598@gmail.com and portersean68@gmail.com) were associated with the seven accounts. Based on this and other information detailed in the Affidavit, it is reasonable to believe that the same person utilized all seven accounts.

b. The only IP addresses utilized to access the seven accounts were an IP address serviced by Charter Communications (74.136.165.234) and IP addresses serviced by the Verizon cellular telephone network. Based on my training and experience, I know that the use of IP addresses serviced by Charter Communications is consistent with someone using wireless Internet service at a residential or business location to access the Internet. I also know that the use of IP addresses serviced by Verizon is consistent with someone using the data plan from his/her cellular telephone or tablet to access the Internet.

c. A different birthday was listed for each of the seven accounts. I noted that each of the birthdays used the same months and days of the months as the dates that the accounts were registered, with the year being 2000 for the first six accounts (which were registered in 2020) and 2001 for the last account (which was registered in 2021) – therefore purportedly making the user 20 years old, with his birthday being the same dates as the dates that the accounts were registered.

i. Based on my training and experience, I know that individuals who utilize electronic accounts in furtherance of their criminal activities often use fictitious identifying information (such as names and birthdays) when registering their accounts as a means to conceal their identities from law enforcement officers.

ii. Based on the trend of the birthdays and other information detailed in the Affidavit, it is reasonable to believe that the account user was using fictitious birthdays when registering his Wildec LLC accounts.

61. On or around February 25, 2021, an administrative subpoena was served upon Charter Communications requesting subscriber information for the IP address of 74.136.165.234 (the IP address utilized to access the seven Wildec LLC accounts detailed above) on a sample of four of the dates and times that it was utilized to access the one of the "Sean" accounts (the account with the user identification number of 47432599). Records received from Charter Communications in response to the subpoena identified that this IP address was subscribed to PORTER at the SUBJECT PREMISES. The records identified that this IP address had been

leased to PORTER's account during the approximate time period of September 27, 2019 through March 4, 2021 (the date that Charter Communications produced the records in response to the subpoena).

62. On or around March 16, 2021, an administrative subpoena was served upon WhatsApp requesting subscriber information associated with the WhatsApp account associated with telephone number 937-626-4691 (the telephone number that PORTER has used to communicate with PO Owens). Records received in response to the subpoena identified that there was a WhatsApp account associated with this telephone number. The only subscriber information available for the account was the model number for the device utilized to access the account – that being an Android device with a model of DIGILAND DL1023.

a. Based on Internet research, I have determined that a DIGILAND DL1023 Android device is a tablet.

b. As detailed above, PO Owens has only authorized PORTER to utilize a flip-style cellular telephone and a Samsung tablet. PO Owens has not reviewed or monitored any other electronic devices.

c. Based on my training and experience, I know that individuals who are involved in child exploitation offenses and who are on probation or parole often conceal the devices that they use in furtherance of their criminal activities from their probation or parole officers. Such individuals often utilize multiple devices – one or more devices that they report to their probation or parole officers (which may be searched pursuant to the terms of their supervision) and other devices that they do not report (which they use for their child exploitation activities).

63. Consumer Cellular was identified as the service provider for telephone number 937-626-4691 (the telephone number that PORTER has used to communicate with PO Owens and that is associated with the WhatsApp account detailed above). On or around March 31, 2021, an administrative subpoena was served upon Consumer Cellular requesting subscriber information for telephone number 937-626-4691. Records received in response to the subpoena identified that this telephone number is subscribed to a **SEAN** PORTER at a PO box in Dayton, Ohio. The date of birth listed for the subscriber matches the date of birth listed on PORTER's Ohio driver's license.

64. Text Now Inc. was identified as the service provider for telephone number 937-568-5895 (the telephone number that "Sean" used to communicate with UCO-2). On or around March 31, 2021, an administrative subpoena was served upon Text Now Inc. requesting subscriber information for this telephone number. Records received in response to the subpoena identified that the telephone number was subscribed to an individual utilizing a user name of portersean67 and an email address of **portersean67@gmail.com**. The account was registered on or around October 4, 2020 utilizing the IP address of 74.136.165.234 (the IP address subscribed to PORTER at the SUBJECT PREMISES).

Search Warrant to Wildec LLC

65. As detailed above, records received in response to two administrative subpoenas identified that there were seven Wildec LLC accounts associated with the email addresses sean2598@gmail.com and portersean68@gmail.com – that being accounts with identification numbers of 45521409, 45675752, 45766959, 45834215, 45868159, 45887212, and 47432599. Also as detailed above, the following information was noted from the records received in response to the subpoenas:

    a. The user names associated with six of the seven accounts was "Sean", and the user name associated with the seventh account (the account with the user identification number of 45887212) was "Mike".

    b. All of the accounts utilized the IP address of 74.136.234 (the IP address subscribed to PORTER at the SUBJECT PREMISES) to access the accounts.

    c. Based on all of the information detailed in the Affidavit, it is reasonable to believe that the same person utilized all seven accounts. This person will hereinafter be referred to as the "Subject Account User".

66. On or around March 30, 2021, a search warrant was authorized by the United States District Court for the Southern District of Ohio for information associated with the seven Wildec LLC accounts noted above (the accounts with identification numbers of 45521409, 45675752, 45766959, 45834215, 45868159, 45887212, and 47432599). In response to the search warrant, Wildec LLC provided account contents (including messages, images, and videos exchanged via the application's messenger feature) for six of the seven accounts – that being all of the accounts except for the account with the identification number 45868159, which did not contain any account contents.

67. Records received from Wildec LLC for the six accounts included thousands of messages exchanged with other users. Only a preliminary review of some of these messages has been conducted as of this time. The below information was noted based on the messages that have been reviewed to-date:

    a. In communications contained in all six accounts, the Subject Account User identified himself by the name "Sean" on one or more occasions. Although the account with the identification number of 45887212 used a profile name of "Mike", the Subject Account User identified that his true name was "Sean" on at least approximately 18 occasions.

    b. In communications contained all six of the accounts, the Subject Account User generally identified himself as being 57 or 58 years old (which matched PORTER's age at the time of the communications). However, there were also some occasions in which the Subject Account User identified himself as being other ages. In addition, there was at least one occasion in which the Subject Account User told another user his birthday

(to include the month, day, and year), and this birthday matches PORTER's date of birth.

c. In communications contained all six of the accounts, the Subject Account User generally identified that he lived in Dayton, Ohio. However, there were some occasions in which he identified that he lived in other states.

i. Based on my training and experience, I know that many locations in Miami Township, Ohio (including the SUBJECT PREMISES) utilize a Dayton mailing address.

d. In communications contained in five of the six accounts, the Subject Account User told other users on at least approximately 25 occasions that his address was the SUBJECT PREMISES. In addition, there were approximately two occasions in which the Subject Account User sent photographs of his residence to other users. It appears that these photographs depict the SUBJECT PREMISES.

e. In communications contained in five of the six accounts, there were at least approximately 63 occasions in which the Subject Account User identified that his telephone number and/or WhatsApp number was 937-626-4691 (the telephone number that is subscribed to PORTER and that PORTER has utilized to communicate with PO Owens). In communications contained in one of the accounts, there were at least approximately 37 occasions in which the Subject Account User identified that his telephone number was 937-568-5895 (the TextNow telephone number that "Sean" used to communicate with UCO-2 and that is subscribed to portersean67).

f. In communications contained in five of the six accounts, the Subject Account User told other users on at least approximately 96 occasions that he was employed as a tile contractor.

i. As detailed above, PO Owens identified that PORTER is self-employed and has a business where he installed flooring units

g. In communications contained in five of the six accounts, the Subject Account User told other users on at least approximately 27 occasions that he had a 21-year old son.

i. As detailed above, PO Owens identified that PORTER has an adult son.

h. In communications contained in five of the six accounts, the Subject Account User exchanged image and video files with other users. The Subject Account User sent at least approximately 46 images and videos depicting PORTER to other users (and some of these 46 images and videos were sent to multiple other users).

i. In communications contained in two of the accounts (the accounts containing the identification numbers of 45887212 and 47432599), the Subject Account User received

at least approximately six images depicting child pornography from other users and distributed at least approximately six images depicting child pornography to other users. Below are examples of four of these files:

i. File ID 163464201: The file is an image that depicts what appears to be a nude pre-pubescent white female child who is sitting with her legs spread apart. The child is inserting her fingers into her vagina. The Subject Account User received this image from another user on or around November 27, 2020. After receiving the image, the Subject Account User stated the following: "Yeah", "and she looks cute I wouldn't mind licking that p****".

ii. File ID 165981137: The file is an image that depicts what appears to be a nude pre-pubescent Asian female child sitting on a bed with her legs spread apart, exposing her nude vagina to the camera. The Subject Account User sent this image to another user on or around February 5, 2021.

iii. File ID 166044590: The file is an image that depicts what appears to be a nude pre-pubescent white female child who is kneeling on a bed, exposing her nude vagina and anus to the camera. What appears to be an adult white female is licking the child's nude anus. The Subject Account User sent this image to another user on or around February 7, 2021.

iv. File ID 166273940: The file is an image that depicts what appears to be a toddler-aged white female child who is wearing a shirt but is nude from the waist down. The child is squatting on the ground with her legs straddled. What appears to be a penis is inserted into the child's vagina. The Subject Account User received this image from another user on or around February 14, 2021.

j. Communications and images exchanged between "Mike" and UCO-1 were recovered from the account with the identification number of 45887212. Communications, images, and videos exchanged between "Sean" and UCO-2 were recovered from the account with the identification number of 47432599.

k. In communications contained in four of the accounts, the Subject Account User exchanged messages with at least approximately 52 other users who specifically identified themselves by their ages as being minors (to include UCO-1 and UCO-2). These approximately 52 other users (hereinafter referred to as "suspected minors") identified themselves as being 10 to 17 years old, and that they lived in various states around the United States as well as in various other countries. It should be noted that none of these suspected minors have been contacted by law enforcement officers as of this time, so their true identities and ages have not been verified. The communications with the suspected minors included the following:

i. The Subject Account User requested at least approximately 26 of the suspected minors to send him photographs of themselves. The Subject Account User

typically did not specify what type of images he wanted from the suspected minors. However, there were times when he did in fact solicit the suspected minors for nude images and/or images of their genitalia – such as the communications with UCO-1 and UCO-2 that are detailed above. By way of example, below are excerpts from two chats in which the Subject Account User made specific requests for nude images of two suspected minors (who will be referred to as "Suspected Minor-1" and "Suspected Minor-2"). An additional example is detailed in the preceding paragraph in the communications with "Suspected Minor 3".

<u>Suspected Minor-1 (on or around February 7, 2021)</u>:

| | |
|---|---|
| Suspected Minor-1: | I'm 11 |
| | . . . . . |
| Sean: | do you have another picture of you |
| Suspected Minor-1: | Yeah y |
| Sean: | have you ever rubbed yourself down there |
| Sean: | can I see a picture of you |
| Sean: | Down where |
| Sean: | your vagina |
| Suspected Minor-1: | Noooo |

<u>Suspected Minor-2 (on or around January 29, 2021 to February 2, 2021)</u>:

| | |
|---|---|
| Sean: | so do you remember me |
| Sean: | we sent a lot of sexy pictures back and forth |
| Suspected Minor-2: | I do remember your picture but I don't exactly remember our conversation |
| Sean: | you're only 15 right |
| Suspected Minor-2: | Yep |
| Sean: | all we talked about sex and stuff like that |
| | . . . . . |
| Suspected Minor-2: | is there a chance I can get you horny now |
| Sean: | *Sends image of a male's penis* |
| Suspected Minor-2: | Hmmm yes |
| Suspected Minor-2: | Hoooot |
| Sean: | do you like baby |
| Suspected Minor-2: | Yeah |
| Sean: | I wish I could see you naked |
| Suspected Minor-2: | Ohhhh |
| Sean: | is there any chance |
| Sean: | *Sends image of a male's penis* |
| Suspected Minor-2: | I don't think I can show full nude |
| Sean: | why not |

ii. In total, the Subject Account User received clothed images from at least approximately 18 of the suspected minors, partially clothed images from at least

approximately four of the suspected minors, and images depicting sexually explicit conduct (to include the lascivious display of the genitalia) from at least approximately eight of the suspected minors. Although the identities of these suspected minors have not yet been verified, the images depicting sexually explicit conduct would constitute child pornography if the suspected minors identified their true ages in the communications. After receiving the images, the Subject Account User often told the suspected minors that he thought they were attractive, that he wanted to engage in sexual activities with them, and/or that he masturbated to their images. By way of example, below are excerpts from communications in which the Subject Account User received images depicting sexually explicit conduct from two of the suspected minors (who will be referred to as "Suspected Minor-3" and "Suspected Minor-4").

Suspected Minor-3 (on or around November 14 to 16, 2020):

| | |
|---|---|
| Suspected Minor-3: | I am boy I am 15 years old |
| Suspected Minor-3: | I am looking for fun |
| Sean: | I'm 57-year-old man is that okay |
| Sean: | do you want to see my dick |
| Suspected Minor-3: | Yes |
| Sean: | *Sends image of a male's penis* |
| Sean: | where are you from |
| Suspected Minor-3: | I am from jordan |
| Suspected Minor-3: | Wow |
| Sean: | do you like that dick |
| Suspected Minor-3: | Yes I lick |
| Sean: | let me see your dick |
| Suspected Minor-3: | It's big |
| Suspected Minor-3: | *Sends image of what appears to be a boy's penis* |
| Sean: | you got a cute little dick |
| Sean: | do you got a picture of it hard |
| Sean: | *Sends image of a male's anus* |
| Suspected Minor-3: | *Sends image of a male's buttocks* |
| Sean: | you got a cute ass |
| Sean: | have you always like men |
| Sean: | *Sends image of a male's penis* |
| Suspected Minor-3: | Some men like you, I admire them |
| | . . . . . |
| Sean: | let me see a picture of your dick hard |
| Sean: | *Sends image of a male's penis* |
| Suspected Minor-3: | Wait until my dick is hard |
| Suspected Minor-3: | *Sends image of a person's lips* |
| Sean: | you're making my dick hard right now |
| Sean: | I would love to see those look for up around my cock |
| Sean: | lips |

|  |  |
|---|---|
|  | . . . . . . |
| Sean: | *Sends image of a male who appears to be PORTER completely nude* |
| Suspected Minor-3: | My ass will take the size of your dick |
| Suspected Minor-3: | *Sends image depicting a male's anus* |
| Sean: | why don't you get your dick hard and show me your dick when it's hard that way I can suck your dick too while you're sucking mine |
| Sean: | you got a nice cock |
| Sean: | I genuinely would love to suck that cock |
| Sean: | *Sends image of a male who appears to be PORTER completely nude* |
|  | . . . . . |
| Sean: | when do you want to co e to usa |
| Suspected Minor-3: | Any time I have the opportunity |
| Sean: | what would your parents say |
| Sean: | what would you tell them |
| Suspected Minor-3: | I hope my dad intends to come to the USA |
| Sean: | when is he coming |
| Sean: | and where |
| Sean: | can you chat elsewhere |
| Suspected Minor-3: | I do not know |
| Suspected Minor-3: | No |
| Sean: | I could send videos elsewhere |
| Sean: | don't you have h a n g o u t s |
| Suspected Minor-3: | If I used another program, I will tell you here |
| Sean: | this app sucks |
| Sean: | I want to suck your cock |
| Sean: | I want to fuck and lick your sweet little ass |
| Sean: | let me see your ass again |
| Suspected Minor-3: | My father placed the ban in my phone on social media programs because of the study, I accidentally found this application that was not covered by the ban |

Suspected Minor-4 (on or around February 12 to 13, 2021):

|  |  |
|---|---|
| Sean: | how old are you |
| Suspected Minor-4: | 16 |
| Sean: | so what kind of fund are you looking for |
| Sean: | do you like older men |
| Suspected Minor-4: | They're okay |
| Sean: | have you been with an older man |
| Suspected Minor-4: | I just chat and pics |
| Sean: | do you want to see my pictures or what kind of pictures |
| Suspected Minor-4: | I usually show then get a show |

| | |
|---|---|
| Sean: | okay so show me then |
| Suspected Minor-4: | *Sends image of a female wearing an open / unbuttoned shirt, bra, and underwear* |
| Sean: | wow you look good |
| Sean: | *Sends image of a male's penis* |
| Sean: | I would love to have sex with you |
| Suspected Minor-4: | Ow wow |
| Sean: | do you like |
| Suspected Minor-4: | Yea |
| Sean: | where are you from |
| Sean: | *Sends close-up image of a male's hand holding his nude penis* |
| Sean: | are you there |
| Sean: | ok good day |
| Suspected Minor-4: | *Sends image depicting what appears to be the same female wearing only an open / unbuttoned shirt, exposing her nude vagina and breasts* |
| Sean: | you look so lickable |
| Sean: | love your breast |
| Sean: | let's hook up |
| Suspected Minor-4: | I don't do hookups |
| Sean: | have you had sex before |
| | . . . . . . |
| Sean: | how long ago was the last time you had sex |
| Suspected Minor-4: | Last week |
| Suspected Minor-4: | *Sends image of a female's anus with what appears to be a penis partially inserted into her anus or vagina* |
| Sean: | you got a pretty little butt |
| Sean: | would you like me to lick it for you |

iii. The Subject Account User sent at least approximately 15 of the suspected minors clothed images of a male who appears to be PORTER.

iv. The Subject Account User sent at least approximately 26 of the suspected minors images of a male's penis or anus and/or videos of a male masturbating. Approximately 17 of these 25 suspected minors identified that they were under the age of 16 years old. Approximately nine of the images that the Subject Account User sent to the suspected minors included the man's face, and it appeared that the man is PORTER. Examples of some of these images are described above in the communications with Suspected Minor-2, Suspected Minor-3, and Suspected Minor-4.

1. Based on my training and experience, I believe that most of the images and videos noted above are obscene.

v. The Subject Account User offered money to one of the suspected minors (who will be referred to as "Suspected Minor-5") in exchange for a nude image of herself. Below are excerpts from this conversation, which transpired on or around January 25, 2021.

| | |
|---|---|
| Sean: | I'm 47 how old are you |
| Suspected Minor-5: | 16 |
| Sean: | do you have a boyfriend |
| Suspected Minor-5: | no |
| Sean: | so why do you like talking to older men |
| Sean: | do you like to have fun on here sexual fun |
| Suspected Minor-5: | can u send some money |
| Sean: | what do you need money for |
| Suspected Minor-5: | i do |
| Sean: | let me see a nude picture of you and I'll send you some money |
| Suspected Minor-5: | by |

vi. The Subject Account User talked about sexual activities with at least 30 of the suspected minors. These discussions included (but are not limited to) the Subject Account User asking the suspected minors about what types of sexually explicit conduct they had previously engaged in, the Subject Account User encouraging the suspected minors to masturbate, and the Subject Account User discussing the types of sexually explicit conduct he wanted to engage in with the suspected minors. Below are excerpts from one of the chats in which the Subject Account User talked to a suspected minor (who will be referred to as "Suspected Minor-6") about sexual activities. These communications transpired on or around February 2 through 14, 2021.

| | |
|---|---|
| Suspected Minor-6: | Hi I'm Molley I'm 13 |
| Sean: | hello Molly how are you doing |
| Sean: | my name is Sean and I'm 47 |
| Sean: | are you there |
| Suspected Minor-6: | Yes I'm there |
| Sean: | do you like talking to older men |
| Suspected Minor-6: | I like talking I don't have many friends |
| | . . . . . |
| Suspected Minor-6: | Ok yes. Do you like talking to me I'm only 13 |
| Sean: | yes I like talking to you do you think that's perverted |
| Suspected Minor-6: | No we are just talking |
| Sean: | what if the talk got sexual |
| Suspected Minor-6: | Haha I don't know about sexual |
| Sean: | is there anything you would like to learn |
| Sean: | you don't have to be shy sweetheart |
| Suspected Minor-6: | What do you mean about sexual I don't understand |

| | |
|---|---|
| Sean: | you know about like a man's penis and a woman's vagina having sex |
| Sean: | you can't tell me you never thought about having sex |
| Suspected Minor-6: | What are they then |
| Sean: | would you like to see my penis |
| | . . . . . . |
| Sean: | when I was 13 years old I used to masturbate five times a day |
| Suspected Minor-6: | What's masturbate |
| Sean: | that's one you play with yourself |
| Sean: | it makes you orgasm |
| Sean: | and an orgasm feels so god |
| Sean: | I know lots of girls who play with themselves now and they are like 10 11 and 12 years old |
| Sean: | I've got a 10-year-old daughter and I know she does it because I can hear her in her bedroom doing it |
| Suspected Minor-6: | Play with myself orgasm I don't understand |
| Sean: | why don't you try rubbing yourself on your vagina and see how it feels |
| | . . . . . |
| Sean: | I'm 47 years old and I am an old pervert I like talking to young girls |
| Sean: | does that bother you |
| Suspected Minor-6: | I like talking a lot my mom tells me shut up you talk to much |
| Sean: | so you don't care that I'm an old pervert |
| Sean: | that's why I wanted to talk about sex |
| | . . . . . |
| Sean: | so do you like me would you like to talk about sex |
| Sean: | it makes me hard to sit here and talk to you |
| Suspected Minor-6: | We can talk |
| Sean: | so what do you think about you making my penis hard when we talk |
| Suspected Minor-6: | Why would it get hard I don't understand |
| Sean: | because talking to you sexually excited me |
| | . . . . . |
| Sean: | I want you to tell me what you think |
| Sean: | *Sends image of a man's penis* |
| Suspected Minor-6: | Oh why did you send that |
| Sean: | so you could see it do you like it |
| Suspected Minor-6: | I think it's scaring me |
| Sean: | why is it scaring you |
| Suspected Minor-6: | It don't look like the books in school |

vii. Between on or around January 28, 2021 and February 8, 2021, the Subject

Account User talked to another user who identified herself as being 13 years old and from Cincinnati, Ohio (who will be referred to as "Suspected Minor-7"). The Subject Account User sent Suspected Minor-7 two images of his genitalia and talked about sexual activities he would like to engage in with her. The Subject Account User made plans to pick up Suspected Minor-7 so that he could take her to dinner. The Subject Account User repeatedly asked Suspected Minor-7 for her address, but she refused to provide it. It did not appear that they actually met each other.

viii. The Subject Account User asked some of the suspected minors about their friends or relatives, including if their friends or relatives liked older men.

l. Similar to the communications between "Sean" and "UCO-2", the Subject Account User told at least approximately 32 other users that he had sex with his daughter. The Subject Account User told the other users that his daughter was 10 to 13 years old. At least approximately nine of the other users with whom the Subject Account User had these discussions were suspected minors. The following additional information was noted regarding these communications:

i. Similar to the communications with UCO-2, there were a few occasions in which the Subject Account User later told the other users that he did not actually have a daughter.

ii. The image that "Sean" sent to UCO-2 of the purported daughter was an image that the Subject Account User received from Suspected Minor-7 (the individual who identified that she was 13 years old and lived in Cincinnati, Ohio, as detailed above). Suspected Minor-7 sent the Subject Account User approximately two photographs of herself. In addition to UCO-2, the Subject Account User also sent one or both of the two images he received from Suspected Minor-7 to at least approximately three other account users when he talked about his purported daughter.

iii. In or around February 2021, the Subject Account User communicated with an individual who identified herself as being 11 years old and from the United Kingdom (the same individual referred to above as "Suspected Minor-1"). The Subject Account User told Suspected Minor-1 that he had sex with his 13-year old daughter. The Subject Account User thereafter appeared to pose as the purported 13-year old daughter and communicated with Suspected Minor-1 via this persona. Below are excerpts from this conversation.

| | |
|---|---|
| Sean: | I have a daughter that looks like you and she is your age and we have sex when she's here every other weekend |
| Suspected Minor-1: | I'm 11 |
| Sean: | my daughter is 13 |

| | |
|---|---|
| Sean: | we started when she was 10 |
| Sean: | you think about sex? |
| Suspected Minor-1: | Nah not really |
| Sean: | do you like to talk about it |
| | . . . . . |
| Sean: | did I show you a new picture of me |
| Sean: | why don't you try rubbing yourself down there |
| Suspected Minor-1: | I no wot u look like |
| Sean: | but you don't know what my penis looks like |
| Suspected Minor-1: | Y u wanna show me |
| Sean: | do you want to see it |
| Suspected Minor-1: | Ain't it naughty |
| Sean: | yeah it's kind of naughty but that's what makes it exciting |
| Sean: | just make sure you don't keep it |
| Sean: | that way your parents will never find out |
| | . . . . . |
| Sean: | you want to know how it started with me and my daughter |
| Suspected Minor-1: | I dnt see my dad wit no clothes ono |
| Suspected Minor-1: | Yeah |
| Sean: | *Sends image depicting a male's penis* |
| Suspected Minor-1: | How it start |
| Suspected Minor-1: | Won't let me open |
| Sean: | well she was 10 years old she walked into the bathroom when I was taking a shower and I was just coming out and she saw me all naked |
| Suspected Minor-1: | Oh |
| Sean: | she laughed and said I'm sorry Daddy kept looking at my penis no longer she looked it started getting hard |
| Sean: | did you see the picture |
| Suspected Minor-1: | Y u not lock door |
| Sean: | I didn't think it was necessary |
| Suspected Minor-1: | *Sends image showing an error message* |
| Sean: | anyway she reached out and grabbed it |
| Sean: | oh well you don't get to see it |
| Suspected Minor-1: | Y she do that |
| Sean: | she said Daddy you got a nice penis she said it's big |
| Sean: | so I let her touch it and she started stroking it |
| Sean: | she said one time she saw Mommy doing that to me |
| Suspected Minor-1: | Reli |
| Sean: | me and my wife were divorced I get her every other weekend |
| Suspected Minor-1: | so she kept stroking it and then she to my surprise put her mouth on it |
| | . . . . . |

Sean: yes I do think you're beautiful I think you're a sweetheart and you do turn me on talking to you
Sean: my daughter's coming over tonight
Sean: would you like to talk with her when she gets here
Suspected Minor-1: Yeah if she wants
Sean: I know she'll want to talk to you
Sean: my daughter liked girls her age

. . . . .

Sean: Jennifer is here she's anxious to talk to you
Suspected Minor-1: I'm ere
Sean: he Charlie this is Jennifer
Sean: my dad told me you've been talking to you this morning
Suspected Minor-1: Hi
Sean: I think you are very pretty Charlie
Sean: I like girls too
Suspected Minor-1: Thx
Sean: I have a girlfriend right now who is 11 years old I'm trying to get my dad to let all three of us have fun together if you want to allow it

. . . . .

Sean: daddy said you never had sex before even with a girl
Suspected Minor-1: No
Suspected Minor-1: Ave u
Sean: I've been with girls since I was about 11
Sean: but I've only been with girls my age
Sean: daddy is the only guy I've been with

. . . . .

Sean: I've got a 12 year old girlfriend that see my dad and she wants to have sex with him but he won't let it happen because he's afraid that she might end up telling

. . . . .

Sean: I bet your vagina is cute
Sean: Daddy thinks I have a beautiful vagina
Sean: he won't take any pictures of me even when he could because he doesn't want anything illegal on his tablet

. . . . .

Sean: you know it's okay to feel sexual it's okay to touch yourself down there it's okay to like penises
Sean: you know what Daddy just told me
Suspected Minor-1: Wot
Suspected Minor-1: Soz my friend keeps calling
Sean: he just told me when he was talking to you this morning that he was looking at your picture and he was rubbing his penis and he shot a load

. . . . . .

| | |
|---|---|
| Suspected Minor-1: | But I am 11 how can I b sexy |
| Sean: | because you are a loving years old he thinks all girls that are 11 12 13 14 are sexy |

m. In communications contained in five of the six accounts, the Subject Account User and the other individuals with whom he was communicating discussed moving their communications to Google Hangouts or WhatsApp. Some of these instances involved communications with the suspected minors (such as the communications detailed above in which the Subject Account User suggested communicating with Suspected Minor-2 via Google Hangouts). The Subject Account User identified that his Google account was portersean67 or **portersean67@gmail.com** on at least approximately 108 occasions.

n. In communications contained in five of the six accounts, the Subject Account User told the other users on at least approximately 37 occasions that he was using a tablet. These communications included the following:

i. On or around October 29, 2020, the Subject Account User told another user that he was only able to make calls on his telephone, and that he had to use his tablet for video calls.

1. As detailed above, PO Owens reported that PORTER has a flip-style cellular telephone. Based on my training and experience, I know that many flip-style cellular telephones do not provide the capability to make video calls.

2. Also as detailed above, the records from WhatsApp indicate that PORTER had a DIGILAND DL1023 tablet. As noted above, PORTER has not reported using this tablet to PO Owens (as he is required to do pursuant to the terms of his supervised release) and therefore is not authorized to use it.

ii. On or around January 27, 2021, the Subject Account User made comments to another user indicating that he was at work. The Subject Account User then stated the following: "I usually don't go back out to my truck once I get inside the building and I don't bring my tablet in with me".

1. Based on this comment, it is reasonable to believe that the Subject Account User brings his tablet with him when he travels by vehicle.

iii. On or around February 13, 2021, the Subject Account User told another user that he was getting a new tablet on the following day.

o. The Subject Account User told approximately one other user that he had been in federal prison before (consistent with PORTER's previous conviction for possession of child

pornography).

Surveillance Activities

68. On or around April 8 and 9, 2021, I observed SUBJECT VEHICLE-1 and SUBJECT VEHICLE-2 parked in the driveway of the SUBJECT PREMISES. On or around April 9, 2021, I observed the SUBJECT VEHICLE-1 drive away from the SUBJECT PREMISES. I followed this vehicle as it traveled to West Chester Township, Ohio and then Florence, Kentucky. I observed a male get out of the SUBJECT VEHICLE-1 in West Chester Township, Ohio, and this male appeared to be PORTER.

Conclusion Regarding Use of Accounts

69. Based on the information detailed above, there is probable cause to believe that PORTER is the Subject Account User (i.e., the user of the seven Wildec LLC accounts containing the profile names of "Sean" and "Mike" and the identification numbers of 45521409, 45675752, 45766959, 45834215, 45868159, 45887212, and 47432599). There is also probable cause to believe that PORTER is the user of the following:

a. Telephone numbers 937-626-4691 and 937-568-5895;

b. The WhatsApp account associated with telephone number 937-626-4691; and

c. The Google accounts associated with the email addresses stphs141963@gmail.com, sean2598@gmail.com, portersean68@gmail.com, and **portersean67@gmail.com**.

70. Also based on the information detailed above, there is probable cause to believe that PORTER has utilized at least four of his Wildec LLC accounts and at least one tablet to (1) coerce and entice minors to produce and send him child pornography; (2) to distribute, receive, and possess child pornography; (3) to transfer obscene materials to minors; and (4) to persuade, induce, entice, or coerce minors to engage in criminal sexual activities.

Evidence Available in Email, Social Media, and Messaging Accounts

71. In my experience, individuals often post information on their social media accounts, dating websites, and messaging accounts (such as Skype, WhatsApp, Snapchat, and Google Messaging) about other electronic accounts that they utilize – including their email addresses, other social media accounts, and messenger accounts. This information may provide evidentiary value to child exploitation investigations in that it may help in identifying other accounts utilized by the offenders in furtherance of their child exploitation activities.

72. Based on my training and experience, I am aware that individuals involved in child exploitation schemes often communicate with others involved in similar offenses about their victims and sexual activities via e-mail, social media accounts, dating websites, and messaging accounts

(such as Skype, WhatsApp, Snapchat, and Google Messaging). I have seen examples of cases where such individuals have communicated with other child predators about their sexual fantasies and prior sexual activities with juveniles. I have also seen cases where such individuals have communicated with others about their remorse and regret for their activities. Both types of communications provide material evidence in child exploitation cases in that they provide admissions of guilt.

73. Also in my experience, individuals involved in child exploitation schemes often utilize email, social media accounts, dating websites, and messaging accounts (such as Skype, WhatsApp, Snapchat, and Google Messaging) as a means to locate and recruit victims. They then use the chat functions on these and other websites, as well as email accounts, to communicate with their victims. Such communications provide a means of anonymity to protect the subjects' identities and to conceal the communications from the victims' parents.

74. Based on my training and experience, I know that individuals involved in child pornography offenses often obtain and trade images with each other via a variety of means, including email, photo sharing services (such as Google Photos), social media accounts, dating websites, and messaging accounts (such as Skype, WhatsApp, Snapchat, and Google Messaging). Individuals also often attempt to obtain child pornography from a variety of sources, including from those with whom they communicate via email, social media sites, Internet chat programs, Internet bulletin boards, Internet Peer-to-Peer file sharing programs, Internet websites, and other sources. I have also seen a number of cases in which individuals email files containing child pornography to themselves – either from one email account to another or from and to the same email account – in order to transfer the files from one electronic device to another.

75. Based on my training and experience, one or more aliases are often used by individuals involved in child exploitation offenses as a means to avoid detection from law enforcement. It is not uncommon for such offenders to create multiple identities, sometimes involving different ages and genders. Offenders sometimes fictitiously portray themselves as juveniles as a means to gain trust and rapport with victims. Offenders also sometimes obtain photographs of other individuals from the Internet to use as their profile pictures and/or to send to the victims. Based on the records obtained by Wildec LLC, it appears that PORTER has utilized various aliases and false identities.

76. Based on my training and experience, I know that many social media accounts, Internet websites, and telephone providers require users to provide their email accounts when registering for the accounts. The social media and Internet account providers then send the users various notifications regarding messages from other users, information accessed by users, information available by the websites, and other information. Telephone providers often send bills to their customers via email. These messages can provide material evidence in cases involving child exploitation offenses because they help in identifying what social media, Internet accounts, and telephone account that were utilized by the subjects to communicate with other subjects and victims and what accounts were utilized by the subjects to find child pornography. In addition, the messages help in identifying the identities of other subjects and victims.

77. Based on my training and experience, I know that providers of cellular telephone service and Internet Service Providers typically send their customers monthly billing statements and other records. These statements and records are sometimes mailed to the customers' billing addresses and other times are emailed to the customers' email accounts. These documents can be materially relevant to investigations of child pornography and child exploitation offenses in that they provide evidence of the Internet and cellular telephone accounts utilized in furtherance of the crimes.

78. Also as noted above, email providers maintain various subscriber and user information that their users provide when registering for its accounts. Some email providers also require payment for certain services or features. Such information is materially important in cases where online accounts are utilized to trade child pornography, as this information can help in confirming the identities of the individuals using the accounts and committing the offenses.

79. Email providers maintain various logs of IP addresses utilized to access the accounts. The IP information is again materially important in child pornography investigations. This information helps in identifying the subjects and the locations where their computer devices are located.

Evidence Sought in Other Google Accounts

80. Google Contacts provides users with address books to store their contacts. Based on my training and experience, I know that individuals involved in child pornography offenses often store contact information for their co-conspirators and their victims in their contact lists. This information can be materially relevant to identifying the co-conspirators and victims.

81. Google Calendar provides users with appointment books. In my training and experience, individuals involved in child pornography offenses may store information in their appointment books about meetings with their victims.

82. Google's Chrome and My Activity service stores information about Internet searches conducted by its users. Such information is materially relevant in child exploitation investigations, as it may help in identifying websites used by subjects to obtain child pornography and locate victims.

83. Google Drive, Google Keep, and Google Photos provide users with cloud computing and online file storage. In my experience, individuals with large collections of child pornography may utilize cloud computing and online storage accounts as a means to store their files after their hard drives become full and/or as a means to back up their files. In addition, individuals utilize these services as a means to conceal their files from others, including law enforcement.

84. Google Android Backup provides users with the ability to backup data on their cellular telephones and other electronic devices. Such data can be materially relevant in cases in which cellular telephones and other electronic devices are used to commit child exploitation offenses,

as this data may provide historical records of their criminal activities that are no longer saved on the devices.

85. As detailed above, Google Location History is an application in which Google utilizes various data such as cell site information and Wi-Fi routers to locate and geo-locate a cellular telephone device. Google collects and stores this data if the application is enabled by the user, either during the set-up of the device or through the device's settings. Also as detailed above, Google Maps stores information about maps and directions searched for on Google's search engine.

86. Based on my training and experience, I know that location information from cellular telephones and Google accounts, as well as maps and directions searched for on the Google search engine, can be materially relevant in investigations involving child exploitation offenses. This information provides evidence of the travels undertaken by the subject when meeting with possible victims. Data regarding the subjects' whereabouts as obtained from location information can corroborate statements made by the subjects and victims and provide evidence of the locations where the criminal activities took place. Furthermore, data regarding the subjects' whereabouts as obtained from the location information can lead to the identification of the places where computer devices used in furtherance of the crime may be present.

Conclusion Regarding Probable Cause

87. Based on all of the information detailed above, there is probable cause to believe that information associated with the Google account **portersean67@gmail.com** may contain evidence of PORTER's child pornography and child exploitation offenses.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

88. I anticipate executing the requested warrant for the listed account under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google LLC to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachment B-1. Upon receipt of the information described in Section I of Attachment B-1, government-authorized persons will review that information to locate the items described in Section II of Attachment B-1.

## CONCLUSION

89. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2), 2252A(a)(5)(B) and (b)(1), 2252(a)(2) and (b)(1), 2252A(a)(2) and (b)(1), 18 U.S.C. §§ 2252(a) and (e), 18 U.S.C. § 2422(b), and 18 U.S.C. § 1470, are present in the information associated with the above noted account (as described in Attachment A-1).

90. I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B-1.

91. Because the warrant for the account described in Attachment A-1 will be served on Google LLC, who will then compile the requested records at times convenient to that entity, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Special Agent Andrea R. Kinzig
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this 14th of April 2021

Sharon L. Ovington
United States Magistrate Judge